588 A.2d 476

**Michael J. JACOBINI, Appellee,**

v.

**V. & O. PRESS COMPANY, Danly Press Corp., and George D. Guyer, Inc.**

**Appeal of DANLY MACHINE CORP.**

Supreme Court of Pennsylvania.

Argued Dec. 4, 1990.

Decided March 20, 1991.

34

John C. McNamara, Philadelphia, for appellant.

Richard M. Jurewicz, Philadelphia, for Michael Jacobini.

George D. Guyer, pro se.

Before NIX, C.J., and LARSEN, FLAHERTY, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

The appellee, Michael G. Jacobini, commenced this action for damages after suffering injuries at his place of employment, on October 10, 1980, when a power press he was operating expelled a die and materials being shaped by the die. The defendants named in this action were the V. & O. Press Company, the manufacturer of the power press; George D. Guyer, Inc., the builder of the die; and the appellant, Danly Machine Corporation (Danly). Danly was the manufacturer of a device known as a die set, which was

sold to the builder of the die and incorporated into the completed die. A die set is the foundation to which a die is attached. A die contains the forms against which metals are pressed in a power press.

After presentation of the evidence at trial, appellee withdrew his claims alleging negligence and elected to proceed solely on a theory of strict product liability under Section 402A of the Restatement (Second) of Torts. See generally *Lewis v. Coffing Hoist Div., Duff–Norton Co., Inc.*, 515 Pa. 334, 528 A.2d 590 (1987) (liability for unreasonably dangerous products under Section 402A of the Restatement (Second) of Torts). The trial court later directed verdicts in favor of all of the defendants, based upon the following findings.

It is undisputed that the manufacturer of the power press equipped it with a barrier guard to prevent objects from being ejected therefrom, and that the guard would likely have prevented the injury which occurred. Sometime during the years after the press was manufactured, but before appellee's employer acquired it, the barrier guard was removed. The trial court held that this relieved the manufacturer of the press from liability.

It was also undisputed that the accident was caused by appellee's failure to properly align a tool holder in the die. The misalignment caused parts of the die to be expelled from the press. The trial court held, therefore, that appellee's injuries were caused by the error in aligning the tool holder rather than by any defects in the die or die set. Appellee's evidence had established the necessity for dies to be designed in a manner that eliminates the need for operators to place their hands or fingers within the point of operation, i.e., the area of the press where work is performed upon the materials inserted. The die in question met that design requirement. The trial court concluded that the die was not rendered defective by the fact that it did not have a guard known as a "barrier guard" attached to it that would have prevented expulsion of parts. It also held that neither the die nor the die set was rendered

defective by their lack of having warnings affixed to caution that dies should be used only in areas equipped with barrier guards. Accordingly, directed verdicts were entered in favor of the manufacturers of the power press, the die, and the die set.

An appeal was taken to the Superior Court, challenging the directed verdicts entered in favor of the die and die set manufacturers. The directed verdict in favor of the power press manufacturer was not contested. The Superior Court, in a memorandum decision, vacated the challenged verdicts and remanded for a new trial. 390 Pa.Super. 661, 561 A.2d 825. We granted allowance of appeal, upon a petition filed by the die set manufacturer, Danly. Hence, only the directed verdict pertaining to Danly is at issue in this appeal.

The Superior Court held that the question of the liability of Danly should have been submitted to the jury based upon a "failure to warn" theory under Section 402A. Appellee's contention was not that the die set itself should have been equipped with a guard to protect the operator, but rather that Danly should have warned against the use of the die set with dies or power presses that lacked such guards. Appellee claims that Danly's failure to provide this warning rendered the die set an unreasonably dangerous product.

■■■■ It is well established that there are circumstances where a manufacturer's failure to warn of latent dangers in the use or operation of a product can render a properly designed product unreasonably dangerous and defective for purposes of strict product liability. *Sherk v. Daisy–Heddon*, 498 Pa. 594, 450 A.2d 615 (1982). It is also recognized that limits on a manufacturer's duty to warn are placed at issue where, as in the present case, the manufacturer supplies a mere component of a product that is assembled by another party and dangers are associated with the use of the finished product. *Wenrick v. Schloemann–Siemag Aktiengesellschaft*, 523 Pa. 1, 564 A.2d 1244 (1989) (plurality opinion addressing strict liability for defective components). The case *sub judice* can be viewed, however, as not requir-

ing a precise application of these principles, on the basis that the evidentiary record was simply not sufficient to support submission of a "failure to warn" theory to the jury.

The record was ostensibly inadequate to support a theory that Danly should have provided a warning that a guard, of a type that would have prevented the injury suffered by appellee, was necessary. Indeed, the only testimony that Danly should have provided any warning at all was an opinion from an expert witness, who was a safety engineer with expertise in the areas of presses and dies, that a cautionary label should have been provided on the die set indicating that a "point of operation guard" should be used. A point of operation guard is, however, rather limited in its function. Point of operation guards were frequently described in the testimony as being de-signed to protect an operator from inserting his hands or fingers into the operating area of the die press. Yet, quite obviously, appellee was not injured by inserting his hands or fingers into the press, but rather by expulsion of parts from the press.

The testimony of the expert witness was directed primari-ly at establishing that the die itself lacked certain locking devices and such additional guards as would have prevented expulsion of parts from the press. The testimony included, however, an expression of the following opinions regarding the die set:

[Counsel for appellee]:

**Q.** Pertaining to the die set involved in this accident, are you familiar with that?

**A.** Yes.

**Q.** Now, are there any hazards in your opinion that are associated with the die set?

**A.** The die set of and by itself—

[Counsel for the die manufacturer]: Are you talking about a general die set?

38

[Counsel for appellee]: No, the die set involved in this particular accident.

**A.** The die set in this particular accident. When the die builder purchased this from the die set manufacturer, the die set manufacturer knowing that the die builder was going to place certain pieces of material into the die set in order to develop and produce a workable die, should have put a warning label on the unit to the effect, if I can use my own terms, *warning, danger, caution, not to be used without a point of operation guard.*

**Q.** And what would the purpose of this warning be?

**A.** So that the operator in this instance would have the opportunity to realize that he needs some protection.

**Q.** And who should this warning be conveyed to?

**A.** The operator. By operator, I am referring to the employee.

(Emphasis added).

While the appellee's expert witness did convey in some portions of his testimony a need for die press operators to be protected against objects being ejected from points of operation, he did not testify expressly that die set manufacturers should warn against such hazards. Instead, he only stated a need for die set manufacturers to warn that point of operation guards were required. In determining whether appellee met his burden of establishing that an expansive warning should have been provided, i.e., a warning pertaining to ejection of objects from points of operation, we are constrained by the testimony actually presented.

As the Superior Court noted in its discussion of the expert's testimony, the expert did not clearly distinguish between the two types of guards that were referred to in this case. While he repeatedly referred to point of operation guards, he never expressly referred to guards designed to prevent objects from being expelled from the point of operation as being known under other designations, for example "barrier guards" or "gates," such being terms commonly used in the industry and used by other witnesses at trial in describing such guards. While he described the

dangers associated with expulsion of parts from die presses, he did not state that the die set manufacturer, as opposed to the die manufacturer, should address such dangers.  Although one could construe broadly the witness' reference to the die set manufacturer's need to provide warnings regarding point of operation guards, so as to include protection against any hazard associated with or emanating from the point of operation, we believe that such an approach would unduly expand the meaning of the language actually employed by the witness.

■ In any products liability case, it is the plaintiff's burden to demonstrate that the injuries sustained were proximately caused by the product's defect.  *Sherk v. Daisy–Heddon*, 498 Pa. at 598, 450 A.2d at 617.  Here, the defect indicated by appellee's expert witness was that the die set manufacturer failed to warn of the need for a point of operation guard.  Since the injuries sustained were not ones that a typical point of operation guard would have avoided, and, in fact, the die in use was constructed in a manner that eliminated the need for operators to place their hands or fingers into the operational point of the die press, it cannot be said that the failure to warn of the need for a point of operation guard was a cause of the injuries sustained.

■ Even assuming, *arguendo*, that the testimony presented by appellee's expert witness could be construed as indicating a need for barrier guards as part of point of operation safeguards, appellee would be placed in the untenable position of establishing that the die set manufacturer, as the manufacturer of a mere component of a completed die, would have a duty to warn the end user of dangers associated with using the die in a power press manufactured by yet another party.  As noted earlier, however, limits on a manufacturer's duty to warn come into play where, as in the present case, the manufacturer supplies a mere component of a final product that is assembled by another party and dangers are associated with the use of the finished product.  *Wenrick v. Schloemann–Siemag Ak*

*tiengesellschaft, supra.* This is particularly true where the component itself is not dangerous, and where the danger arises from the manner in which the component is utilized by the assembler of the final product, this being a matter over which the component manufacturer has no control. *Id.*

No dangers were associated with the present die set, and it was not claimed that the die set should have had a guard. Indeed, plaintiff's expert witness testified as follows upon cross-examination:

**Q.** Do you agree that the die set as built by Danly and involved in this case did not need a guard?

**A.** Yes.

Certainly, too, the die set manufacturer had no role in the design or manufacture of the die or power press. Thus, we perceive no basis for requiring the component part manufacturer, Danly, to investigate the use of its part, the die set, which by itself was inert and safe. Danly cannot be expected to foresee every possible risk that might be associated with use of the completed product, the die, which is manufactured by another party, and to warn of dangers in using that completed product in yet another party's finished product, the power press. To recognize a potential for liability through such a chain of responsibility would carry the component part manufacturer's liability to an unwarranted and unreasonable extreme.

It is well established that in reviewing the propriety of a directed verdict we must accept as true all facts and inferences tending to support the party against whom the directed verdict has been granted, rejecting all testimony and references to the contrary. *Morosetti v. Louisiana Land and Exploration Co.*, 522 Pa. 492, 496, 564 A.2d 151, 153 (1989). Nevertheless, viewing appellee's evidence against the die set manufacturer in this light, we believe the evidence against Danly was insufficient to permit the question of liability to be submitted to the jury. The order of the Superior Court, insofar as it vacated the directed verdict entered in favor of Danly, must therefore be reversed.

Order reversed in part.

LARSEN and PAPADAKOS, JJ., concur in the result.

McDERMOTT, J., did not participate in the consideration or decision of this case.